Jay D. Weiner, #182247
jweiner@rosettelaw.com
Rosette, LLP
1415 L St. Suite 450
Sacramento, CA 95814
(916) 353-1084

Attorney for Intervenor The Klamath Tribes

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| KLAMATH IRRIGATION DISTRICT, | **Case No.: 1:19-cv-00451-CL (lead)**<br>Case No.: 1:10-cv-00531-CL |
| Plaintiff, | |
| v. | |
| UNITED STATES BUREAU OF RECLAMATION; DAVID BERNHARDT, Acting Secretary of the Interior, in his official capacity; BRENDA BURMAN, Commissioner of the Bureau of Reclamation, in her official capacity; ERNEST CONANT, Director of the Mid-Pacific Region, Bureau of Reclamation, in his official capacity; and JEFFREY NETTLETON, in his official capacity as Area Manager for the Klamath Area Reclamation Office, | DECLARATION OF DONALD C. GENTRY IN SUPPORT OF THE KLAMATH TRIBES' MOTION TO INTERVENE AND MOTION TO DISMISS |
| _____ Defendants | |
| SHASTA VIEW IRRIGATION DISTRICT, KLAMATH DRAINAGE DISTRICT, VAN BRIMMER DITCH COMPANY, TULELAKE IRRIGATION DISTRICT, KLAMATH WATER USERS | |

Declaration of Donald C. Gentry            1

ASSOCIATION, BEN DUVAL, and ROB
UNRUH,

                    Plaintiffs,

v.

UNITED STATES BUREAU OF
RECLAMATION; ERNEST CONANT, in his
official capacity as the Regional Director of
the Mid-Pacific Region of the United States
Bureau of Reclamation; JEFFREY
NETTLETON, in his official capacity as the
Area Manager of the Klamath Basin Area
Office of the United States Bureau of
Reclamation,

                    Defendants

I, Donald C. Gentry, state and declare as follows:

1.  I have served as a member of Tribal Council of the Klamath Tribes since 2010.  I have

    served as Chairman of the Tribal Council since 2013.

2.  I have personal knowledge of the history and culture of the Klamath Tribes.

3.  Since time immemorial, the Klamath Tribes and their members have used, and continue

    to use, the resources of the Klamath Basin in what is now the states of both Oregon and

    California for subsistence, cultural, ceremonial, religious, and commercial purposes.

4.  C'waam (Lost River sucker or *Deltistes luxatus*) and Koptu (shortnose sucker or

    *Chasmistes brevirostris*) have played a central role in the Tribes' cultural and spiritual

    practices, and were once the most important food-fish to the Tribes.

5.  The Klamath Irrigation Project was developed within and around the Klamath Tribes'

    ancestral homelands and waters.

6.  Attached hereto as Exhibit A is a true and accurate copy of the letter I sent on behalf of

    the Klamath Tribes to Jeff Nettleton, of the U.S. Bureau of Reclamation, regarding

Declaration of Donald C. Gentry                    2

Comments of the Klamath Tribes on Reclamation's November 1, 2018 Proposed Action

Summary on November 30, 2018.

7. Attached hereto as Exhibit B is a true and accurate copy of the letter I sent on behalf of

the Klamath Tribes to Jeff Nettleton, of the U.S. Bureau of Reclamation, regarding

Comments of the Klamath Tribes on Reclamation's December 12, 2018 Draft Proposed

Action Chapter of the Biological Assessment on December 16, 2018.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Signed on August 16, 2019 at Chiloquin, Oregon.


_____

Donald C. Gentry

Chairman for the Klamath Tribes


Declaration of Donald C. Gentry                3

# EXHIBIT A



November 30, 2018

Jeff Nettleton
Klamath Basin Area Office
U.S. Bureau of Reclamation
6600 Washburn
Klamath Falls, OR 97603

# The Klamath Tribes
## Tribal Council

**RE:  Comments of the Klamath Tribes on Reclamation's November 1, 2018, Proposed
Action Summary**

**By E-mail**

Dear Mr. Nettleton:

The following are the comments of the Klamath Tribes ("Tribes") regarding the Proposed Action
Summary ("Summary") released by the Bureau of Reclamation ("Reclamation") on November 1,
2018. The Tribes appreciate the efforts Reclamation has made to date to explain the Summary
and the process by which it will be fleshed out into a Proposed Action incorporated into a
Biological Assessment ("BA") that Reclamation will transmit to the Fish and Wildlife Service
("Service") and the National Marine Fisheries Service ("NMFS"). The Tribes anticipate
supplementing these comments and submitting further comments as Reclamation, the Service
and NMFS make additional information available concerning the Proposed Action, the BA, and
the new joint Biological Opinion ("BiOp").

The Tribes are pleased that Reclamation, the Service and NMFS are committed to expeditiously
completing the reinitiation of consultation required by the Endangered Species Act ("ESA") and
having the Proposed Action evaluated through both the production of a joint BiOp to be issued
by the Service and NMFS as well as pursuant to the mandates of the National Environmental
Policy Act. The expedited schedule for the preparation and issuance of the BiOp was also well
received at the Sucker Recovery Summit held by Senator Jeff Merkley on November 16, 2018 in
the Klamath Basin, where federal agencies and Klamath Basin stakeholders showed a
remarkable consensus that the potential extinction of the sucker fisheries are an ecological and
economic "five alarm fire" and that the new BiOp is a critical opportunity for implementing
time-critical solutions to this crisis.

The Tribes are concerned, however, that while the Proposed Action described in the Summary
appears to be an improvement over Reclamation's Proposed Action that was the subject of the
joint 2013 BiOp and that has governed Reclamation's operation of the Klamath Project
("Project") for the past five years, it does not – in its current form, at least – go far enough to
meet the ESA's mandate of avoiding jeopardy to or the destruction or adverse modification of

501 Chiloquin Blvd. – P.O. Box 436 – Chiloquin, Oregon 97624
(541) 783-2219 – Fax (541) 783-3706

the habitat of the endangered C'waam (Lost River sucker, *Deltistes luxatus*) and Koptu
(shortnose sucker, *Chasmistes brevirostris*) in Upper Klamath Lake ("UKL").

The C'waam and Koptu, treaty-protected Tribal resources, have been essential to the spiritual,
cultural and material wellbeing of the Tribes for millennia. Despite their having been listed as
endangered under the ESA in 1988 (two years after the Tribes voluntarily suspended their
harvest of these fish in order to conserve the diminishing populations), the condition of both
species has continued to decline almost unremittingly. Presently, best estimates indicate that
there are only perhaps 50,000 C'waam and 8,000 Koptu extant. As Reclamation and the Service
are well aware, there has not been substantial recruitment of new juveniles into the spawning
C'waam population for 27 years, and into the Koptu population for 20. The surviving adults are
nearing their maximum life expectancy, and are at ever increasing risk of becoming incapable of
successful spawning as they senesce. Moreover, following on from the die-off event that
occurred in 2017, spawning runs in 2018 at both shoreline springs in UKL and in the Williamson
River were substantially lower than previous years, which strongly suggests higher average
annual mortality rates for the ageing C'waam and Koptu.

Nor are these aging populations susceptible to ready replacement by hatchery-raised fish. It
takes between four to seven years for a C'waam or Koptu to reach sexual maturity, meaning that
even the potential recruitment of such fish into the ranks of spawners is several years away.
Moreover, the results of the Service's initial releases of hatchery-raised fish have not been
encouraging. Of the roughly 2,500 captive-raised two-year-old juveniles the Service PIT-tagged
and released this summer, a subset of 174 were radio-tagged and only a few if any were still
transmitting signals by October. While a large-scale captive rearing program is essential to
preserve the continued viability of the species, it is not sufficient to ensure their continued
existence, and under current conditions will not show any quantifiable increase in the
populations without substantially larger numbers of juveniles released. Rather, every possible
effort must be made to keep the existing adults alive until such time as the recruitment bottleneck
can be sufficiently overcome. But it is on this score that the Proposed Action sketched out in the
Summary appears to fall short.

The Tribes are particularly concerned that the Proposed Action appears to pit the needs of the
C'waam and Koptu in UKL against those of other listed species, such as the Southern
Oregon/Northern California Coast coho salmon downstream in the Klamath River, while
attempting to insulate the Project from hydrologic shortfalls. This is evidenced in the Summary
on page 3, for example, where it is explained that when the Environmental Water Account,
which operates to ensure adequate river flows below Iron Gate Dam, is overspent (i.e. when
more water is released to the river than the EWA budget would otherwise support), "UKL
absorbs the overspend," rather than having the Project absorb the overage through reduced
deliveries. Similarly, on page 4 the Summary shifts the burden of forecasting error regarding
UKL inflows from the Project to the C'waam and Koptu when it states that "Project Supply can
increase after April 1, but cannot decrease below the April estimate if the NRCS forecast
decreases, *with UKL absorbing any subsequent forecasting error.*" (Emphasis added.) The
allocation of risk in this manner is particularly problematic given the critical role UKL elevations
play for the successful spawning and rearing of young C'waam and Koptu in the spring and early
summer, as well as in the ability of older juveniles and adults to withstand and find refuge from

2

the poor water quality conditions that so often occur in UKL during the summer and early fall. It is also inequitable given the fact that, courtesy of Section 4308(b) of the recently-enacted S. 3021 (P.L. 115-270), Reclamation now has at its disposal the authority to spend $10 million per year to mitigate the effects of drought on Project water users while the C'waam and Koptu enjoy no similar protection.

The Tribes understand and respect the need of Project irrigators for certainty and predictability when it comes time for them to make planting and other resource and financial commitments heading into a growing season. But, as noted above, the contemplated April 1 lock-in goes beyond simply providing certainty and directly privileges Project needs ahead of those of the species. A sounder approach would be to allow the estimated Project supply to remain tied to actual inflows through the final June 1 NRCS inflow forecast. In that way, water allocation decisions can be made based on actual, near-real time hydrology rather than on forecasts that often can be wrong despite the best good-faith efforts of the forecasters. This was amply demonstrated in 2016 and 2017, when NRCS forecasting errors contributed to Reclamation missing a series of UKL elevation thresholds set under the 2013 BiOp. Tying the final Project Supply volume to June 1 would also properly incentivize Project irrigators to make the sort of strategic and conservative planting decisions consistent with the downward hydrologic trend of the past decade and the growing market demand for sustainable agricultural commodities. The sooner the Project arrives at a *sustainable* water budget, the better off everyone in the Klamath Basin will be.

Ultimately the allocation of risk to the species rather than the Project in the manner described in the Summary is inconsistent with the ESA's mandate that endangered species be given the benefit of the doubt in the face of uncertainty, *see, e.g., Conner v. Buford*, 848 F.2d 1441, 1454 (9th Cir. 1988), *cert. denied* 489 U.S. 1012 (1989), and indeed "the highest of priorities." *TVA v. Hill*, 437 U.S. 153, 174 (1978). In order to avoid storing up future conflict and litigation, the Tribes urge Reclamation to rethink its approach to hydrologic risk as soon as possible and move forward with a Proposed Action and BA that include a more scientifically focused and legally defensible risk allocation framework.

The Tribes believe that the most equitable way to accomplish this task and balance the needs of all Project stakeholders would be to identify minimum elevations below which UKL would not be allowed to drop under the Proposed Action in order to protect the C'waam and Koptu. No such minima are set forth in the Summary. Rather, Reclamation is apparently purporting to make UKL elevation decisions based on "control logic" related to the "central tendency." The Summary at page 2 explains that this central tendency "adjusts up or down on a daily time step, based on smoothed UKL inflow from the previous 60 days" and that "[t]he central tendency is not a target to which UKL should be managed, but rather a guideline that maintains UKL elevation in line with both hydrologic conditions and *the multiple demands placed on UKL storage throughout the year*." (Emphasis added.) The italicized language in this description further underscores the problematic risk allocation discussed above, and also makes the "central tendency" sound very similar to the concept of the end-of-month "thresholds" that were built into Reclamation's 2012 Proposed Action and BA and the ensuing 2013 BiOp.

3

Both Reclamation and the 2013 BiOp disclaimed that those thresholds were intended to be management targets, but the past five years of Project operations under that BiOp have illustrated that the thresholds have been consistently treated as just that. This appears to be due at least in part to the fact that the 2012 Proposed Action and 2013 BiOp were predicated on optimistic assumptions about Basin hydrology that would have allowed UKL regularly to be maintained at levels exceeding the thresholds without constraining the supply of water available to the Project. Obviously that beneficial hydrology failed to materialize, and indeed the Basin was instead faced with multiple extremely dry years that unfortunately appear to be the new normal. The Tribes suggest that Reclamation and the Service do away with this "not a target" fiction – whether denominated as "thresholds," a "central tendency" or otherwise – and instead focus directly on identifying appropriately protective minimum elevations, corresponding to life cycle needs of the listed species throughout the year, below which Reclamation will not allow UKL to drop irrespective of hydrologic conditions, even if that means curtailing Project deliveries.

The Tribes believe that the best available science supports setting these UKL elevation targets at the Conservation Levels ("CLs") the Tribes have previously shared with Reclamation, which fill UKL every spring and restrict elevations to no lower than 4139.5 feet in the fall months. For ease of reference, the Tribes set forth these minimum elevations in the following table:

| DATE | CONSERVATION LEVEL |
|------|--------------------|
| March 31 | 4,143.0 feet |
| April 30 | 4,143.0 feet |
| May 31 | 4,143.0 feet |
| June 15 | 4143.0 feet |
| June 30 | 4,142.0 feet |
| July 15 | 4,141.5 feet |
| July 31 | 4,141.0 feet |
| August 15 | 4,140.5 feet |
| August 31 | 4,140.0 feet |
| September 15 | 4,139.5 feet |

The Tribes recognize that the early season elevations identified above would need to be subject to Reclamation's flood control rule curves, and that Reclamation's ability to meet these elevations in certain circumstances may be constrained by real-world hydrologic conditions. But we believe that all of Reclamation's management decisions pertaining to the Project should be made with these elevation levels squarely in mind.

The Tribes have been collecting water quality and sucker habitat data on UKL for over two decades and have developed the CLs to provide better calibrated elevations for sucker spawning, rearing and water quality refugia habitat and to mitigate for poor water quality conditions. While climatic factors like temperature and wind have perhaps the greatest influence on UKL water quality in a given year, elevation management is the most important tool within human control for ameliorating negative effects. Lake elevations can be managed to inhibit the growth of algae blooms, which in turn can limit the scale and impact of the late summer bloom crash. Better calibrated elevations under the CLs regime would also help protect C'waam and Koptu from the effects of a second bloom phase that often occurs during the fall. Keeping additional water in the Lake over the winter also helps insure that adequate dissolved oxygen levels are maintained when the Lake develops hypoxia-inducing ice cover and sufficient water for spring-time spawning at shoreline spring habitats.

The Tribes have utilized scientifically defensible data analysis methods including rigorous statistical methods and water quality modeling to support the CLs and the linkage between UKL water quality and lake elevations. Although this information was not considered during the development of the 2013 BiOp, it should be considered in the current process to produce a new BiOp covering Project operations because it is the most up-to-date scientific information. Given the dire status of the C'waam and Koptu populations discussed above, the acute need to protect and preserve the remaining adult members of the species until the recruitment bottleneck can be overcome, and the ESA regulatory requirement that a conservative approach be utilized to ensure that endangered species are given the benefit of the doubt, the Tribes strongly believe Reclamation should include the CLs as explicit management targets in the new Proposed Action.

An additional comment the Tribes have about the Proposed Action described in the Summary has to do with how Reclamation plans to manage water introduced into UKL as a result of upstream water regulation. As the Tribes clearly expressed in Chairman Gentry's letter to Jeff Nettleton of October 9, 2018, we were angered and disheartened by Reclamation's diversion for late-season Project use this year of water that flowed into UKL this summer as a consequence of the Tribes' calls made to vindicate our senior water rights against upstream diverters. Along with subverting the species protection purposes for which the Tribes made the calls, Reclamation's late season diversions decreased UKL elevations coming out of an exceedingly dry year at precisely the moment that the focus of UKL operations should have shifted to increasing elevations with an eye toward building a buffer – for both the species and the Project water users – to hedge against the clear and present danger of 2019 turning out to be yet another poor water year. While the Summary does not address in any way water made available pursuant to Tribal calls, it does recite that Reclamation is working with the Service and NMFS to develop "a narrative in the Biological Assessment" relating to how water introduced into UKL by virtue of Project calls is managed. Not least since the Project's rights are junior to

the Tribes', the Tribes are quite concerned with this aspect of the Proposed Action as well. But given the paucity of information on this point contained in the Summary, we must await further details before we can provide more substantive comments.

Thank you for this opportunity to provide these comments on the Summary. The Tribes look forward to remaining engaged with Reclamation, the Service, NMFS, the lower river tribes, and other Klamath Basin stakeholders, including through the provision of additional comments, as the Proposed Action is refined through the preparation of the BA and BiOp, and as we collectively work toward a sustainable future for all of the people and species of the Klamath Basin, most acutely the critically endangered C'waam and Koptu.

Sincerely,

Donald C. Gentry, Chairman

Cc:    Brenda Burman, Commission of Reclamation
       Paul Souza, Regional Director, US Fish & Wildlife Service
       Barry Thom, Regional Administrator, National Marine Fisheries Service
       Senator Jeff Merkley
       Senator Ron Wyden

6

# EXHIBIT B



# The Klamath Tribes

December 16, 2018

Jeff Nettleton
Klamath Basin Area Office
U.S. Bureau of Reclamation
6600 Washburn
Klamath Falls, OR 97603

**RE:    Comments of the Klamath Tribes on Reclamation's December 12, 2018, Draft
        Proposed Action Chapter of the Biological Assessment**

**By E-mail**

Dear Mr. Nettleton:

The Klamath Tribes ("Tribes") appreciate this opportunity to provide comments regarding the draft Part 4 (Proposed Action – "PA") of the Biological Assessment ("BA") released by the Bureau of Reclamation ("Reclamation") after 5pm on December 12, 2018.  The Tribes must register our disappointment, however, at the extraordinarily short deadline Reclamation has set for the submission of comments on the draft PA.  While we understand that you are operating under an internally-constrained time frame in light of the President's Memorandum of October 19, 2018, the window of barely 96 hours that you have afforded the public to digest the draft PA and submit comments does not seem well considered to allow for the sort of careful analysis that would enable meaningful stakeholder participation in the draft PA's refinement.  Nonetheless, the Tribes have endeavored to meet your deadline, though we may need to supplement these comments further and will certainly be providing additional comments as Reclamation makes more information available as it moves to finalize the BA and the Fish and Wildlife Service and National Marine Fisheries Service work through the preparation of the new joint biological opinion ("BiOp") for the Klamath Project ("Project").

The Tribes recognize that the draft PA provides significantly more detail than was contained in the Proposed Action Summary ("Summary") Reclamation released on November 1, 2018.  As it is cut from the same cloth, however, the draft PA gives rise to the same set of concerns the Tribes identified in our comment letter of November 30, 2018, which we submitted to you regarding the

Draft PA Comments
December 16, 2018
Page 2

Summary. Consequently, the Tribes incorporate those comments herein by reference.  The Tribes also incorporate herein by reference the attached spreadsheet, which presents our line-by-line comments on the draft PA in the format you have requested.

Ultimately, the Tribes continue to believe that the draft PA does not go far enough to protect the endangered suckers and their habitat.  We believe the minimum lake levels we have identified as "Conservation Levels" are a necessary component of any legally viable Proposed Action.   We look forward to continuing to work with you and other Klamath Basin stakeholders to ensure that we can collectively emerge from this reconsultation process with a BiOp that complies with the Endangered Species Act by providing meaningful protection for the critically endangered C'waam and Koptu, as well as the SONCC coho salmon, and that provides a pathway for the Project to move to a genuinely sustainable footing going forward.

Sincerely,

/s/ *Donald C. Gentry*

Donald C. Gentry, Chairman

Cc: Brenda Burman, Commission of Reclamation
      Paul Souza, Regional Director, US Fish & Wildlife Service
      Barry Thom, Regional Administrator, National Marine Fisheries Service
      Senator Jeff Merkley
      Senator Ron Wyden

Enc.